# ORIGINAL

UNITED STATES COURT FOR THE

EASTERN DISTRICT OF NEW YORK

GREGORY PAPADOPOULOS, Plaintiff



v.

INDEX NUMBER: _____

JURY TRIAL DEMANDED

SUMMONS ISSUED

IRIZARRY, J.

ALFONSO (ALFY) FANJUL

JOSE (PEPE) FANJUL, Defendants

MANN. M.J.

## COMPLAINT

I Gregory Papadopoulos duly sworn deposes and says:

I am bringing this action against the defendants for running a RICO type of enterprise in cooperation with high ranking officials of the Federal Bureau of Investigation for profit. Starting with 1997 this Enterprise, subsequently referred as the FBI-Palm Beach Mafia (and abbreviated FBI/PBM) has destroyed my life causing a divorce, whipping me out financially, entangling me with criminal allegations, causing severe physical and mental injuries and in general denying me constitutional rights to property, freedom, and speech.

This action is being brought pursuant to RICO 18 USC 1964 and is seeking a minimum tax free award of $500 million trembled to $1.5 billion as mandated by RICO, plus reasonable attorney fees, as well as future injunctive relief.

Defendants have a habit of routinely bribing and enticing high level government officials, as well as law enforcement and judicial officials, presumed to be immune, to promote their financial interests. During the last 16 years numerous law enforcement and judicial officials in New York and Florida have demonstrated lust and determination by exceeding their statutory authority and abusing their discretion in promoting the financial interests of the defendants. Simultaneously numerous such officials appear to have acquired substantial amounts of wealth clearly disproportionate to their earnings.

Defendants appearing to be socialites, philanthropists and sugar cane farmers are known by several individuals in the narcotics business as substantial narcotics importers, are personally known by Plaintiff to have interests in prostitution rings, are known to be making substantial political and illegal straw contributions and are known by the Plaintiff to routinely destroy the lives of innocent Palm Beach residents and businesses for profit. In the process they have acquired a net worth well in excess of $20 billion far disproportionate to the net worth that any farmer has ever achieved.

A similar smaller scale cooperations between FBI agents and Gangsters was recently uncovered in Boston as the entire FBI Boston office was cooperating with James (Whitey) Bulger, Stephan (Rifleman) Flemmi and the Winterhill Gang. See McIntire v US Government 367 F 3.d 38 and US v John Connelly 402 F .3d 79.  In general a cooperation between FBI agents and Gangsters has formidable synergy powers, can acquire substantial wealth and can indefinitely perpetuate its existence. Such conspiracies are difficult to uncover and prove, however it took the courage, persistence and determination for justice of the Honorable Chief Judge Mark Wolf of the District of Massachusetts to uncover that conspiracy. Eventually Judge Wolf was instrumental in triggering criminal actions against Bulger, Flemini and FBI agent John Connolly and costing the FBI about $100 million in restitution to the victims of their corruption.

This Court has Jurisdiction pursuant to 28 USC 1331 as Plaintiff and Jose (Pepe) Fanjul both have residences in New York. This Court is also believed to have jurisdiction pursuant to 28 USC 1332 as Plaintiff is a citizen of New York, Alfonso (Alfy) Fanjul is believed to be a citizen of Cuba and the Dominican Republic and Jose Fanjul is believed to be a citizen of Florida. Defendants have numerous residences in New York, Florida, the Dominican Republic and others.  Defendants are believed to be US permanent residents and not citizens thus essentially evading US taxation and other disclosures. It is ironic that defendants contribute millions to US politicians and yet have no right to vote in this country.

This Court has also Jurisdiction as the most egregious acts of imprisoning Plaintiff to prevent him from appearing in front of the US Supreme Court and also preventing him from lobbying for the phasing out of sugar subsidies, occurred while Plaintiff was a resident of Queens.

This Court has also jurisdiction pursuant to RICO.

Last this RICO action is timely. In 2009 Plaintiff believed that the "Godfather" of the Palm Beach Mafia was a George Matthews do to his influence in the Town of Palm Beach, local Police Department and Private School in the Town. In 2010-11 Plaintiff started changing his views and suspecting that the Defendants in this action were probably the "Godfathers" but had no tangible proof. In late 2011 during the criminal proceedings Plaintiff became reasonably convinced and in 2013 after extensive research was able to produce sufficient evidence and tangible proof to bring an action believed to survive dismissal. Plaintiff was certain that it was the FBI trying to bring his demise as early as 2000 but had no conviction as to who enticed or bribed the FBI. Plaintiff as required by RICO made heroic efforts and due diligence, such as filling lawsuits and investigating their operations and their victims, however it was not until early 2013 that he was able to generate sufficient proof. Defendants are masters of public relations suppressing derogatory movies, articles, and judicial decisions. They appear aristocratic, social and philanthropic and it is extremely difficult to identify and prove them as Gangsters. Jose's daughter owns and runs a PR firm.

## **Background and prior litigation**

Starting with 1997 the FBI commenced an investigation and electronic surveillance of Plaintiff. At the time Plaintiff was neighbor with both defendants in Palm Beach Florida. The FBI at the time had no probable cause to commence an investigation as Plaintiff had no past criminal record or was engaging in any criminal activities. Plaintiff was an exchange member and floor trader engaging in option trades with other professional traders. During the investigation the FBI was routinely harassing Plaintiff and his family for the purpose of intentionally causing his financial demise and the brake up of his family.

Starting with 2001 massive amounts of litigation commenced. Plaintiff was sued for divorce, Plaintiff sued numerous entities and individuals acting in concert with the FBI/PBM, numerous entities and individuals acting in concert with the FBI/PBM retaliated by suing Plaintiff and Plaintiff commenced several federal civil rights actions in New York and Florida as well as two bankruptcies.

Plaintiff brought an action in the against the FBI, Palm Beach Mafia and Palm Beach Chief of Police SDNY 08CIV11256. Plaintiff at the time had no knowledge or proof as to who the "Godfathers" of the PBM were, and was relaying on discovery

to prove his claims. The case was summarily dismissed however claims against the "Mafia" were never specifically addressed or dismissed. Dismissal of the case was affirmed at the 2nd Circuit and the opinion was written by a certain **judge native of Puerto Rico**. To prevent him from filling a petition in the US Supreme Court defendants entangled Plaintiff with a prostitute a Julia Mineeva working for the NYC Fanjul Prostitution Ring. Mineeva made false allegations of verbal harassment and Plaintiff was strangely imprisoned for an alleged verbal misdemeanor. As a result of the incarceration 12 booklets prepared for US Supreme Court were never delivered to the Court and the time for filling a petition expired.

Similarly, Plaintiff exercising his constitutional right to petition the government convinced Senators Shaheen(NH)  Kirk(IL) and Lugar(IN) to sponsor legislation ending federal sugar subsidies and import quotas. These subsidies are estimated to contribute $65 million per year to the Defendants and cost $5 billion to the consumers. The proposed acts "Sugar Act" and "Free Sugar Market" never came to a vote as Defendants appear to have advanced substantial contributions to every member of the House and Senate Agricultural Committees while Plaintiff was detained at Rikers Island by a Criminal Court **Judge native of Puerto Rico**. The Attorney appointed to him during the Criminal proceedings was also a young lady **native of Haiti** who repeatedly refused to withdraw.

Plaintiff upon his release filed a federal action against the State seeking damages for malicious prosecution and false imprisonment. Strangely again this action was assigned to **Judge native of Puerto Rico**.

At the very least this action is for claims subsequent to early 2010 and Plaintiff will argue that this period is extended in accordance with the "injury and pattern discovery" rule and his 6 month detention back to 2002.

**Proof of the allegations of the existence of the cooperation between the FBI and the Defendants.**

Conspiracies are difficult to prove as they are secretive in nature.

In this case however the pattern of judicial assignments clearly proves the existence of a conspiracy between federal agents and Gangsters from the Caribbean.  For the years 2001-2011 Plaintiff was involved in some 40 State and

Federal Civil cases and one State Criminal case. Most of the civil cases were strangely assigned to a Judges formerly in criminal justice and believed to be ideologically friendly and submissive to the FBI. Judges in Civil courts with a background in criminal Justice are extremely rare. About a third of the civil cases were assigned to judges from the Dominican Republic, Puerto Rico and Jamaica and believed to be ideologically friendly to the defendants or easily enticed by them. In the entire NYC there are less than ten Judges from these islands and yet Plaintiff got almost all. As already stated the criminal case was assigned to a judge from Puerto Rico and his attorney was a native of Haiti. NYS Criminal Court Judges are predominantly Jewish American with a few African Americans.

In sum, every substantive case was assigned to a judge formerly in criminal justice or a Judge from the Dominican Republic, Puerto Rico and Jamaica. In every court federal or state, civil or criminal, supreme or civil, district or appellate, there is no more than one, or maybe two, Judges that satisfy this criteria for selection out of a total population of 20-45 judges in the court. And yet in some 40 cases Plaintiff repeatedly got the one Judge out of some 20-45 judges that satisfied the selection criteria.

This pattern of judicial assignments proves the following:

1. The FBI/PBM by "hacking" into Plaintiffs computer/word processor had advance knowledge of Plaintiffs litigation plans. They therefore rushed ahead of him in every court and insured that each case was assigned to a friendly judge before Plaintiff even appeared in court, filed a complaint and paid the fees.
2. In the eyes of the FBI/PBM it made no difference whether a case was assigned to a judge formerly in criminal justice or a judge from the Dominican Republic, Puerto Rico or Jamaica. (nearby islands) Judges with such background and origin were all deemed desirable. No case that Plaintiff was ever involved was ever assigned to a Judge deemed pro civil rights ideologically liberal.
3. This pattern clearly proves a continuous RICO pattern as defined in 18 USC 1961-68, and numerous US Supreme Court decisions.

Of course as a result of these assignments Plaintiff never prevailed in any of the 40 cases or in any of some 300 motions and as a result lost all his wealth and family.

See **APPENDIX** for a detail description of the more substantive cases and judicial assignments establishing a RICO pattern.

Plaintiff an expert in probability theory and statistics calculated that the cumulative probability of all these assignments being random was less than 1 out of a very large number 50 digit long, and therefore definitively impossible.

**Circumstantial Evidence**

There is additional overwhelming circumstantial evidence of a Gangster-Law Enforcement conspiracy.

The courts have repeatedly found that to prove conspiracy due to its secretive nature circumstantial evidence is sufficient. See Hopkins v. Andaya 958 F .2d 881 888; Santos v. Gates 287 F.3d 846; Haley v. Dormire 845 F.2d 1488 1490; White v. Walsh 649 F.2d 560 561; Sparkman v. McFarlin 606 F.2d 261 268; US v. Williams 714 F.2d 777; American Tobacco v. US 328 U.S. 781 790 66: and the famous Glasser v. US 315 U.S. 60 80 62.

Following is some circumstantial evidence arguing in favor of a conspiracy in chronological order.

1. In 2009, after Papadopoulos v FBI/PBM, SDNY 08CIV11256  was filed former FBI director Freeh fled the country and became Italian citizen.
2. Former Palm Beach Chief of Police was instantly fired and currently lives a lifestyle which would require a net worth of $3-5 million. He was being paid by the Town about $80,000 per year for 20 years and it was not possible to acquire such wealth from his earnings.
3. Julia Mineeva working for the NYC Fanjul Prostitution Ring clearly lied to the police and Plaintiff has tangible proof such as emails, dated pictures, cancelled checks for sex, and Mineeva's dated files in his computer clearly proving the lies.
4. Julia Mineeva, the prostitute is currently employed by a Trump Securities LLC a boutique investment banking firm doing business primarily in Mexico the Caribbean and having a formidable State and Federal record of suing their clients in front of judges from the Caribbean.
5. When Jose Fanjul was served with an information subpoena on Mineeva, he replied through his attorney's affirmation that "I do not know her

personally". He did not reply "I never heard of her" or "Who is Mineeva?". Furthermore his daughter routinely invites Mineeva to society charity functions she is sponsoring and plasters her picture in the NY Social Diary as if as if she was promoting her as a madam.

6. For the years 2001-2009 Defendant Jose personally repeatedly trespassed on Plaintiff's street and property in Palm Beach. Plaintiff lived in a private narrow way. Jose repeatedly walked his dogs and into Plaintiff's street and front lawn without acknowledging Plaintiff. He also enticed a well known neighbor of his living diagonally across the street from him to make numerous uncomfortable appearances in an effort to harass and intimidate Plaintiff. Defendant Alfonso requested once a young lady in Palm Beach, a Giovanna Stephenson to introduce him to Plaintiff but no substantive conversation ensued.

7. The Criminal Court Judge, native of Puerto Rico, who incarcerated defendant for months, recently purchased a $1,000,000 mansion in the Fieldstone section of Bronx. It is financially impossible for someone that after finishing law school and working for 5 years as NYS Assistant DA in the Bronx and for 2 years as a Local Court Judge to accumulate sufficient wealth to purchase and afford such a house. The real estate taxes on the house alone are $10,000 per year.

8. One week after Plaintiff was imprisoned, current FBI Director, to fend Plaintiff's allegations of corruption finally, consented to arresting Whitey Bulger. For 16 years he refused to do so from fear of exposing FBI widespread corruption. He also insured that the criminal case US v Bulger was assigned to the Honorable Judge Stern, openly his best friend. This is further evidence that the FBI routinely assigns cases to a friendly judge when their bribery is an issue.

9. There are numerous other individuals complaining about law enforcement and judicial officials unreasonably promoting the financial interests of the defendants. For example a Phyllis Good after having an extramarital son with one of the Fanjul brothers sued for child support commensurate with her son's father's wealth. Instead of prevailing she was framed with criminal allegations by law enforcement, tried by a judge and the records were sealed. Upon motion to unseal records and collect back owed child support, a Judge having a member of his direct family working for the Fanjuls, detained her, and incarcerated her. While incarcerate she was "hogtied" tortured and suffered severe spinal injuries. This appears to be

typical practice employed by the defendants.  When someone is giving them trouble their reaction is to bribe law enforcement to frame that individual and refer the matter to a friendly judge or a judge from the Caribbean.

10. Routinely the FBI has demonstrated lust and determination in protecting Defendant's financial interests. For example during the late 90's migrant workers working in Palm Beach County harvesting sugar cane tried to unionize. Instantly FBI agents appeared at the scene with dogs. They rounded up the workers and deported them teaching them a lesson that unionizing in a Fanjul Enterprise is strictly prohibited. The workers were not even permitted to get their clothes from the barracks.

11. Repeatedly Hollywood has made movies and shows such as "Strip Tease", "Cane", "Sugarland" and "One Percent" routinely portraying defendants as Gangsters with ties to the FBI and the US Mafia. They are repeatedly portrayed as wealthy Gangsters scheming how to acquire wealth through bribery, extortion, sex and murders. They are also depicted as ruthless slave drivers in their sugar cane farms in Palm Beach County and the Dominican Republic. Plaintiff believes that the producers of these shows conceivably have much more derogatory information that Plaintiff is not aware.

12. Repeatedly public articles compare them to historic gangster figures such as Scarface and conclude: "The Fanjuls make Scarface and the other Cuban Gangsters look like amateurs..."

13. Defendants are estimated by the Plaintiff to have a net worth in excess of $20 billion and other sources list their net worth at $30 billion. It is impossible to make much more than $600 million farming sugar cane over 50 years starting with 4000 acres. They currently own 450,000 acres of sugar cane farmland estimated to produce less than $100 million per year in profits and yet their net worth has been growing by more than $2 billion per year regardless of economic conditions.  The two largest diversified similar firms Conagra and Archer Daniels Midland are only worth about $15 billion in the market after being in business for over 100 years.

## Three year research and investigation

After 16 years Plaintiff became extremely familiar with the techniques and practices of the FBI/PBM. After 16 years they simply become redundant and their actions become repetitive and monotonous. Plaintiff was their neighbor in Palm

Beach Fl. and personally knew over 75% of the residents in the town. From 2010-2012 Plaintiff researched endless articles, judicial assignments, available population of judges, judges' ideology and background, the demise of numerous residents and businesses, and thousands of judicial decisions. Plaintiff also research political contributions, employees of the defendants, and high profile disastrous incidents in Palm Beach. Following are some conclusions regarding their techniques, practices and achievements:

1. Their most common technique is to try to drain financial liquidity of their victim. They can do that by getting you fired or shutting down your business. They can also do that by bringing the demise of a financial institution where you keep your money. Once you have no cash you are forced to liquidate illiquid assets at distress prices. Through third parties then they are able to buy homes, art, jewelry and other valuables for 20 -30 cents on the dollar. If you still have cash they can of course just steal it.

2. Their most lucrative practice is to infiltrate major financial firms connected to a Palm Beach resident. They then can work deals with key employees to siphon out cash offshore. With that same cash they then buy the assets of the bankrupt financial institution at extremely favorable prices during bankruptcy proceedings.

3. In many instances this demise results in divorce, bankruptcy or even suicide. If it is a divorce or bankruptcy they routinely assign the cases to a friendly judge such as a judge formerly in criminal justice or a judge from the Dominican Republic, Puerto Rico or Jamaica and force sale of assets or take over assets. In bankruptcy in particular they also select the trustee to help them out.

4. Through the FBI they routinely harass and inflict severe physical and mental injuries. They arrange "sting" type of operations and defraud their targets as described in the facts in Brown Shutterwhite and Hodson v. US Government. 116 Fed Appx; 526 2004 US App. Lexis 24360.

All these operations were routinely used over 16 years upon Plaintiff and his family and continue to be used. As a result of these operations Plaintiff not only lost $15 million and his family but was also precluded from creating any new wealth and new family as Defendants repeatedly entangled him with prostitutes.

After the 3 years research and investigation Plaintiff concluded the following:

1. In 1992 they brought the demise of Southeast Bank while they were directors and shareholders. Plaintiff had accounts and a mortgage with the bank at the time.
2. In 1996 they were fined $440 million for bribery by the SEC. They were bribing Municipal officials in exchange for Municipal bond underwritings.
3. In 1997 they started bribing high level FBI officials including the director.
4. In 1997 they caused the suicide of the McIntosh family for the purpose of acquiring their commercial property during foreclosure. (3 counts of murder 2)
5. In 1998 they set up President Clinton with Ms. Lewinski for the purpose of impeaching the President. The FBI never investigated the crime of disrupting the government or the more serious crime of attempting to overthrow the government.
6. In 1999 they caused the demise of Independent Trust, a Chicago Trust company where Plaintiff had about $3 million and lost substantial portions of his money.
7. In 2000 they were instrumental in fixing the votes in Palm Beach County and electing President Bush. Their personal lawyer convinced the US Supreme Court to stop the Florida manual vote count and prematurely declare Bush the winner.
8. For the years 1994-2004 they destroyed the lives of some 300 families having children in the Palm Beach Day School. Those families ended up in divorce, bankruptcy and some in suicide and vanished from the town. Plaintiff's family was one of the 300 families.
9. Around 2001 they caused the demise of Abraham Gosman a very wealthy resident living in an $80 million ocean front mansion. His bankruptcy was assigned to their favorite Judge while FBI agents routinely harassed debtor looking for hidden wealth.
10. Around 2004 they unsuccessfully tried to put US Sugar, a competitor, out of business by acquiring their land and their assets with Florida State funds. That appeared to be an intended payoff for electing President Bush. (Clayton Act violation)
11. In 2005 they caused the demise of Refco LLC, the biggest commodities broker in the country. Refco was primarily owned by a Ray Freeman a Palm Beach resident. Plaintiff had about $5 million with that firm and knew and can prove that Refco employees were cooperating with the FBI/PBM.

12. In 2000 they found through Prince Michael of Yugoslavia, a Palm Beach resident close friend of whistleblower Harry Marcopolos that Madoff, also a Palm Beach resident, was a Ponzei scheme. They blocked communication between whistleblowers and the SEC for 10 years and what could have been a $2 billion loss became a $65 billion loss. Eventually the Madoff incident destroyed the lives of numerous Palm Beach residents and the FBI/PBM made a few billions acquiring their illiquid assets at distress prices.

13. As a result of the Madoff operation they caused the suicide of Mr. Rene-Thierry Magon de la Vilehouchet. (1 count of murder 2)The death of Jeffrey Picower also appears suspicious and timely. Picower was in possession of $7 billion and was strangely found drown in the pool of his $33 million Palm Beach ocean front mansion in 2009. Plaintiff believes that he was killed with a heart arresting drug. (murder 1)

14. Repetedly people who accommodate them, when caught and prosecuted just plead guilty and avoid being cross examined at trial thus exposing Defendant's identity. Both Bernard Madoff and Phillip Bennett of Refco and others strangely pleaded guilty and accepted lengthy sentences. Given a choice between death and a lengthy prison sentence they obviously choose the later. Similarly despite heroic efforts Plaintiff has never been able to cross examine or take Mineeva's deposition in several lawsuits.

15. Around 2006 they caused the demise of a Jeffrey Prosser a Palm Beach resident with a substantial telecommunications company in the Caribbean. Fanjul employees repeatedly testified during the bankruptcy proceedings.

16. Around 2009 Alberto Vilar a perceived Cuban philanthropist and partner in projects and close friend of Jose Fanjul ended up in jail for fraud and embezzlement while running a firm Amerindo Investment Advisors. Strangely he was released on appeal.

17. In 2010 they heavily financed Marco Rubio with legal and illegal contributions in his bid for the Senate. Upon election, Mr. Rubio instead of joining the Senate Agricultural Committee to protect sugar subsidies he joined the Subcommittee on Global Narcotics Affairs and the Select Senate Committee on Intelligence obviously to protect the drug trade and the FBI's budget.

18. In 2011 they caused the demise of MF Global. Refco employees who were cooperating with the FBI/PBM moved to MF Global when MF acquired the Refco operations. When MF Global filed for bankruptcy they appointed

former FBI Director Freeh as trustee to take control of some $3 billion in assets.

Most of these assertions are made based on personal knowledge of the relentless demise of Palm Beach residents', extensive research of thousands of judicial assignments and thousands of decisions and 16 year knowledge and experience with the FBI/PBM's techniques and practices. Plaintiff could never find a case where any of their victims ever prevailed in a case or even in a motion. Reading judicial decisions in cases where their victims are a party is actually boring. You can safely guess the victim always loses before you read the decision.

## **Substantiation of Claims**

Plaintiff was well educated having a BA in economics from Columbia Un. and an MBA in finance and statistics with honors also from Columbia Business School. Plaintiff was recommended by the faculty to pursue a Doctorate degree but the Finances did not permit it. After graduation Plaintiff worked for 12 years for Bache & Co. the second biggest broker at the time reaching the title of Vice President, Options Product Manager. In 1986 Plaintiff started his own business Revcon Inc joined the NYSE, AMEX, CBOE and the CME and became a trading force in Wall Street. In 40 years in Wall Street never a client, a supervisor, an exchange, a floor trader or a regulatory authority complained for anything other than once for an honest error.

As a hobby Plaintiff was also acting as a general contractor supervising the construction of several multi-million dollar personal residences.

Plaintiff was also happily married for 30 years and had one son.

From 1978 to 2000 Plaintiff, after repaying off all tuition loans in 1978 was increasing his net worth by 28% per year reaching a net worth of about $15 million by 2000.

Had the FBI/PBM never got involved in his life Plaintiff would have had a net worth of about $500 million at age 70 assuming a 28% growth rate. Plaintiff lived in Palm Beach and the Hamptons and had plans to return to NYC around 2002 to pursue formation and marketing of hedge funds and also place his son in a NYC Private High School as Florida schools were deemed weak and undesirable. He also had plans to upgrade the Palm Beach and Hampton's residences by selling

existing homes and building new homes having five times the value of his old homes just from the sales proceeds.

As a result of the FBI/PBM interference in Plaintiff's life all plans fell through and Plaintiff became indigent around 2008.

Claims are not unreasonable as several individuals with similar education and background with whom Plaintiff used to compete in the trading floors and personally knew are currently listed as having net worth in the billions. A Steve Cohen with similar age and education is currently listed as having a net worth of $9 billion and a Thomas Peterffy has a net worth of $5 billion.

As of the day of this writing the FBI/PBM will not abandon their 16 year efforts to harass, intimidate and insure that Plaintiff remains indigent during the remainder of his life. This is evidenced in the Bankruptcy proceedings (SDNY Bankruptcy Court 12-13125 and 12-1907) where the FBI/DOJ and a Palm Beach Resident working as a team are objecting to a discharge or a dismissal even though there are no assets and income. There are about 12 creditors with about $1.5 million in claims. No creditor objects to a discharge, except for a Palm Beach resident, obviously indirectly financed by the Defendants. That creditor is having a claim of only $90,000. Of course the trustee appointed by the DOJ/FBI is also objecting.

### Conclusions

Based on the above Plaintiff requests a minimum tax free award of $500 million trembled to $1.5 billion from the defendants.

This action is in the best interest of the public. Defendants through bribery have intentionally destroyed the lives of thousands of Palm Beach residents and others, and have destroyed at least $500 billion of their wealth so they can make $20 billion.

In 1960 the people of Cuba revolted, threw them out of the country, expropriated all their Cuban properties and labeled them as "leaches and parasites". Defendants never learned a lesson.

April 7, 2013



KRYSTAL M. MILBY
Notary Public, State of New York
No. 01MI6253978
My Commission Expires 04-02-2016

4/21/13

Gregory Papadopoulos, Plaintiff pre so,  210 E 68, apt 10K  New York, NY, 10065
917-754-7979

Defendants:

Alfonso (Alfy) Fanjul  c/o Fanjul Corp. 1 North Clematis, West Palm Beach Fl.
33401  516-655-6303

Jose (Pepe) Fanjul  3 E 77th st. New York,  NY, 10021    212-535-0843

**APPENDIX**

**DISCUSION OF FEDERAL CASES**

1. **Papadopoulos v FBI    SD of Florida 2001-8659**. Papadopoulos after four years
of being harassed by the FBI filed this case prose. Papadopoulos at that time
had sufficient funds to retain a civil rights attorney; however communications
with civil rights attorneys were being blocked so he preceded prose. To this
date Papadopoulos has never been able to have any type of communications
with any civil rights attorney specializing in police misconduct.  Case was
assigned to Judge Dimitrouleas who instantly dismissed the case. Judge
Dimitrouleas was a former prosecutor for 13 years and obviously had
extensively worked with the FBI. Case was filed in the West Palm Beach
division and strangely moved to the Fort Lauderdale division. All available
judges in WPB, Hurley, Middlebrooks and Ryskamp were deemed undesirable
as none had any background in criminal justice or an origin from the Caribbean

so the case was moved to Fort Lauderdale one hour away where Judge Dimitrouleas was available.

2. **In Re: Papadopoulos SDF Bankruptcy 05-31191**. After an absurd matrimonial decision in NYS Supreme Court awarding the wife $23 million and leaving the husband owing $8 million to the wife Papadopoulos filed for bankruptcy. Case was assigned to Judge Paul Hyman who instantly dismissed the case retroactive to the date of the filling. He also strangely dismissed debtor's lawyer retroactive to the date of the filing to insure debtor had no counsel to appeal. Judge Hyman had an extensive prior career as Assistant US. Attorney in the SDF and obviously had extensively worked with the FBI. There were other available judges at the time however they all had a background in bankruptcy litigation. Judge Hyman eventually has been promoted to Chief Judge in the SDF Bankruptcy Court and repeatedly has been rated as the worse Judge in the country in websites such as "The Robbing Room" and "Robe Probe". The FBI/Palm Beach Mafia (Fanjul brothers) relays extensively on Bankruptcy courts to generate substantial revenue. With a friendly judge, they appoint the trustee and easily take control of assets belonging to individuals and entities they caused the demise. A good example of this process can be seen in "In re: MF Global, SDNY Bankruptcy" where after bringing the demise of Refco and MF Global appointed former FBI director Louis Freeh as trustee to take control of  MF Global assets. In every high profile bankruptcy case of Palm Beach residents the FBI or the Fanjuls have a presence.  The Abraham Gosman case (lost his $80 million oceanfront mansion) was assigned to Judge Hyman and in the Prosser case filed in the Virgin Islands Fanjul employees testified against the debtor.

3. **Revcon Inc (Papadopoulos own firm) v Alaron SDNY 08-CIV01013**   Case involved about $1.5 million in claims since Alaron a brokerage firm improperly liquated accounts on a pretext of a margin call thereby transferring $1.5 million to someone else. Case was originally filed in NYS Supreme Court with the assistance of a lawyer as Papadopoulos could not represent his company. Case was removed to SDNY by the defendant.  Case was assigned to Judge Berman. Without authority from the Plaintiff counsel consented to removing the case to the ND of Illinois. Plaintiff traveled to Chicago, but strangely was unable to retain counsel and case was dismissed. Plaintiff filed his claims prose with the Chicago Mercantile Exchange Arbitration Forum. In an effort to prove fraud, Plaintiff made numerous unsuccessful discovery efforts to obtain the identity of the entity that got the $1.5 million. Plaintiff eventually concluded

that the $1.5 was fraudulently transferred to the FBI/PBM was never seen again and is parked somewhere in the Caribbean.

4. **Papadopoulos v Tenet Good Samaritan Hospital SDNY 08CIV0098** Case was originally filled in NYS Civil Court and removed to the SDNY by the defendant. Plaintiff while resident in NYC sued a West Palm Beach, Florida hospital pursuant to the FCRA for improperly entering derogatory information in his credit report and cutting off credit. Case was assigned to Judge Cote. Judge Cote was a former Chief US Attorney in the SDNY Criminal Division for years and obviously had extensively worked with the FBI. It is highly improbable that Judge Cote was selected by lot as Local Court rules require. In an eight page decision Judge Cote argued that a NYC resident could not sue an out of state entity for entering improper derogatory credit information in his credit report and dismissed the claims. A tortuous act of entering improper derogatory information was committed in every state in the country since the ad was transmitted nationally and Judge Cote appears to have exceeded her discretion, or did not receive a complete set of papers submitted, in dismissing this case. Plaintiff had simultaneously filed three identical cases in NYS Civil. Plaintiff was successful in settling similar cases, before any judge intervened to dismiss them for about $5,000. This case is clear proof of the FBI/PBM cooperation. Good Sam Hospital a West Palm Beach entity under the influence of the PBM spend about $10,000 making a federal case out of nothing and the FBI assigned the case to a Judge affiliated with the FBI. Eventually other Judges used this case as an example claiming all of Plaintiff's cases were frivolous. The most reasonable explanation of why the FBI/PBM spend $10,000 in this case would be that they felt they did not have enough control over the SDNY and wanted to set a precedent that Plaintiff could not sue Palm Beach entities in the SDNY and wanted to force possible subsequent civil rights litigation in Florida Courts where they felt they had more influence and control.

5. **Papadopoulos v FBI, Palm Beach Mafia, Palm Beach Chief of Police Reiter 08CIV11256** Case was assigned to Judge Berman again and Judge Ellis. Upon filing and serving this case Defendant Reiter and member of FBI executive committees was fired. Defendant Reiter after working for 20 years for about $80,000 per year salary now lives the life of a multi-millioner in Palm Beach. He lives the life of someone having at least $3-5 million. Similarly former FBI director Louis Freeh fled to Italy and became Italian citizen. When Papadopoulos filled this case had no knowledge of who the "Godfather" of the Palm Beach Mafia was and had no knowledge of the FTCA and proceeded

pursuant to 42 USC 1983, Bivens and RICO, The case was really decided by Magistrate Judge Ellis who first stayed discovery. Staying discovery in any case where unnamed defendants are named is fatal to the case as the government would not release their identity and obviously the FBI and the Mafia will not identify the Godfather. Judge Ellis recommended dismissing the case pursuant to 42 USC 1983 as the FBI was immune and Judge Berman adopted the RR. Judge Ellis also recommended preemptively dismissing the Town of "West Palm Beach" even though WPB was never listed as a defendant, Plaintiff never lived there, never sued and never served WPB.  Also Judge Ellis ignored statistical proof that all other cases, federal and state, were assigned to judges having a background in criminal justice or an origin from the Caribbean. Judge Ellis is well versed with statistical proof and in fact has written several articles on the field. Judge Ellis also did not address Bivens claims or FTCA and Plaintiff assumed that even though this case was dismissed these claims were not adjudicated pursuant to these statues and these claims were dismissed without prejudice. He proceeded to file therefore three new separate cases and also appealed this case to the Second Circuit. <u>At the Second Circuit dismissal was affirmed and the decision was written by Judge Jose Cabrarnes the only native of Puerto Rico in the Court</u>. Obviously the Clerk of the Court, under the influence of the FBI/PBM, fraudulently changed the list of the defendants and included the Town of WPB as a defendant, so in the event of dismissal, a town was also preemptively dismissed.

6. **Papadopoulos v FBI, SDNY 10CIV4574**  Case was for the same claims as in 08CIV11256 pursuant to FTCA where the FBI could no longer claim immunity. Plaintiff could not pursue FTCA claims in 08CIV11256 since he had to exhaust six month administrative requirements first. Judge Preska appears to have exceeded her discretion, or did not receive a complete set of papers labeling these claims as duplicative since these claims were never adjudicated pursuant to the FTCA.

7. **Papadopoulos v Mineeva SDNY 10CIV4882**    Case was filed against a prostitute working for the Fanjul NYC prostitution ring that the FBI retained to entrap Plaintiff in criminal activities, probably hoping to run out the rather limited FTCA statute of limitations. The cause of action in this case was infliction of severe mental distress and two NYS psychiatrists after reading the complaint concluded that Plaintiff was so distressed that he needed hospitalization. Furthermore claims were asserted pursuant to contracts and Plaintiff included in the complaint the contract and evidence that he

performed. Accordingly it appears that Judge Preska exceeded her discretion, or did not receive a complete set of papers in dismissing these claims. Cases 6, 7 and 8 were all instantly dismissed as frivolous, duplicative and implausible by the newly installed Chief Judge Preska. Judge Preska also issued a filling ban (filling ban appears to have been drafted by Judge Preska's chambers and signed by Judge McMahon who had chambers next door at the time). Plaintiff was warned by the FBI through his son in early 2009 that he will not be able to bring another civil rights case again. Subsequent events indicate that perhaps the FBI/PBM in order to make themselves litigation proof prematurely removed Judge Wood and installed Judge Preska as Chief Judge in an effort to change the ideology of the Chief Judge. Furthermore since Judge Preska had to give notice of an IFP filling ban they staggered processing cases 6, 7. Those cases were simultaneously filed on June 4 2010. However it appears a Ms. Noriega (obviously Latin origin as usual) in the Prose Department held back case number 7 to give enough time to Judge Preska to issue a warning, and after the warning was issued she processed case 7 enabling Judge Preska to install an IFP filling ban with notice. The index numbers assigned to these cases clearly prove the "scam". The FBI and the Mineeva cases were assigned 4574 and 4882 (a very high number giving the impression that this case was filed some time in July) even though they both were filed simultaneously on June 4. The Mineeva case lingers on for weeks, and eventually gets dismissed together with the issuance of a filing ban. Whoever masterminded the "scam" wanted the IFP filling ban to be issued in the Mineeva case thus protecting the FBI from any subsequent publicity that the ban might have brought. Writ Certiorari was prepared for the US Supreme Court for cases 5, 6, 7, served upon the DOJ but the FBI/PBM and Mineeva through bogus criminal allegations and resulting imprisonment precluded Plaintiff from complying with the court's additional requests.

8. **Papadopoulos v Astru, Commissioner of Social Security SDNY 10CIV7980** Papadopoulos applied for disability benefits claiming that the actions of the FBI/PBM had rendered him disable as of 2000. Claims were administratively denied and claimant appealed to the SDNY. Case was assigned to Judge Sweet, who remanded the case. It was in the best interest of the FBI/PBM to create a more complete record of bogus mental illness; however it was not in the FBI's best interest to have the SSA paying for disabilities they inflict. Accordingly determination of disability is in its [5th] year. Judge Sweet openly appears to be one of the most liberal/pro civil rights Judges in the SDNY. He has advocated

legalization of drugs and also asserted that minimum sentences are unconstitutional based on the doctrine of separation of powers, legislative vs. judicial.

9. **Papadopoulos v City of New York, Town of Southampton SDNY 10CIV9454** Case was filed claiming false arrests, malicious prosecution, inflicting personal injuries during arrest, tampering with evidence and selective enforcement of the law as both municipalities arrested Plaintiff for bogus criminal allegations by Mineeva. Both municipalities failed to investigate allegations that Mineeva was a prostitute repeatedly committing the crime of "criminal solicitation in the 5th degree" upon plaintiff by soliciting sex for money. Plaintiff had cancelled checks given to Mineeva for sex and other evidence that Mineeva lied to the police. Case was assigned to Judge Daniels a former public defender and US Attorney for 7 years. Case was instantly dismissed on the basis of the filling ban. Plaintiff tried to make a motion to leave under 10CIV4882 where ban was issued but was told by Ms. Noriega that the motion could not be accepted because case was closed. Plaintiff a few days later submitted the same motion listing the title as "In re: Papadopoulos filling ban" and leaving the index number blank and again Ms. Noriega advised that the motion could not be processed without an index number and to resubmit the motion making up an index number "2000". A few days later Plaintiff, fed up with being "jerked around", just submitted the complaint, and Ms. Noriega cheerfully accepted it. He also wrote a letter to Judge Preska requesting the court issue an index number for the filling ban under which papers could be processed. The letter was never responded.

10. **Gregory Papadopoulos v US Government, FBI, Palm Beach Mafia, Chief Reiter, Mineeva. US Supreme Court 10A865, 10A866, 10A867** Petition for Writ Certiorari was pursued in the US Supreme Court seeking to remand claims against the FBI/PBM.  Petitioner obtained index numbers, compiled 13 booklets as required, personally served one booklet to the DOJ, and 10 booklets to the Court. The Court asked for some additional documents. The additional documents were due on July 17, 2010. After the DOJ/FBI saw the petition and after concluding it was meritorious, enticed NYC Criminal Court Judge Amaker, native of Puerto Rico to illegally incarcerate Petitioner without bail for allegations of a misdemeanor on June 14, 2010 thus preventing petitioner from complying with the Court's additional requests. Petitioner remained involuntarily detained for 6 months and obviously abandoned the petition as it was no longer timely upon his release. The complainant in the

criminal allegation was Julia Mineeva the prostitute with the Fanjul NYC prostitution ring.

11. **Papadopoulos v Amaker, Rabinowitz, Cuomo. EDNY 12CIV3608** Case was filed as a paying case against NYS and its officers claiming malicious prosecution, wrongful imprisonment, wrongful detention in a mental institution, gross violation of civil rights to property, free speech, and infliction of cruel and unusual punishment. <u>Case was assigned to the most desirable Judge the FBI/PBM could find, Judge Irizarri. Judge Irizarri, just like defendant Judge Amaker is a native of Puerto Rico, and 15 year NYS prosecutor and former counsel for the State. By statue as a former counsel for the defendant she cannot sit in this case.</u> Accordingly motion seeking disqualification is pending. It is extremely improbable that Judge Irizarri was selected by lot as Local Court Rules require. There are 26 district judges in the EDNY. 16 have no background in criminal justice or a background with the US Attorney's office. Their background appears to be private and academic. The Honorable Judge Irizzari is also the only judge with an origin from the Caribbean.

12. **In Re: Papadopoulos SDNY Bankruptcy 12-13125** Papadopoulos filed Chapter 7 bankruptcy prose having no assets, $1.3 million in judgments and debts and a SS monthly retirement income of $1,350. There are no Judges with a background in criminal justice or an affiliation with the Caribbean in the SDNY Bankruptcy Court. Nevertheless petitioner filed a motion to withdraw after suffering severe physical injuries and the PBM is objecting through a creditor Zemon. This is another perfect example of how the FBI and the PBM work together. Trustee acting in concert with FBI agents sends debtor to the hospital by ambulance and creditor Zemon residing in Palm Beach acting in concert with the PBM objects to the bankruptcy. Remaining 12 creditors having $1,200,000 in claims don't even bother to appear in three 341 grueling hearings. Also trustee appointed by the US Trustees/DOJ was a brand new trustee an Ian Gazzes retained just for the occasion as obviously no other existing trustee wanted the job of injuring and trying to frame debtor with bankruptcy fraud.

13. **Papadopoulos v President Obama, US Government,  SDNY 12CIV8736** This case was filed against the President and the Government pursuant to FTCA, 42 USC 1983 and Bivens seeking to obtain damages and hoping to bring an end to the FBI/PBM conspiracy. <u>Case was instantly dismissed by Judge Preska on the bases of the IFP filing ban without prejudice.</u> IFP cases are subject to more scrutiny and rarely survive dismissal at the District level. However if they make

it to the US Supreme Court they frequently get remanded. Ms. Noriega in the Prose Department took about one month to mail decision. Last, to this day the court has not established any guidelines on how to proceed with an IFP complaint and has left it to the whimsical discretion of Ms. Noriega. Motions to leave and two requests to be heard in person have been ignored by the court.

14. **Papadopoulos v President Obama, FBI director Mueller EDNY 13CIV810.** Case was filed as a paying case and was again assigned to the Honorable Judge Irizzary a <u>native of Puerto Rico</u>.

15. **Papadopoulos v Clerk of the Court of the SDNY 13CIV724** Recently filled seeking declaratory relief vacating decisions and injunctive relief requiring the Clerk to conduct physical lotteries in assigning cases, and reasonable attorney fees. Plaintiff is proceeding based on FR 60(d) dealing with fraud and 42 USC 1988 dealing with attorney fees in civil rights cases. Claims are for fraudulent practices designed to influence judicial decisions though outright fraud such as intentionally assigning non sequential index numbers to accelerate or decelerate litigation, trashing documents, fixing transcripts by eliminating incriminating statements, making intentional errors for the benefit of the defendants and submitting cases to judges with known and predictable ideology in gross violation of Court Local Rules thereby influencing judicial decisions.

## DISCUSION OF SUBSTANTIVE NEW YORK STATE CASES

1.  <u>**Papadopoulos vs. Papadopoulos. 350414-01 NYS Supreme Court.**</u> <u>This case was originally assigned to Judge Braun a former public defender. Judges with a background in criminal justice are extremely rare in NYC Civil Courts.</u> Judge Braun rendered an absurd decision ordering husband to be paying $100,000 per month in support, legal expenses and property maintenance during the pendency of the divorce. Prior to this action the family's monthly budged was only $40,000. After this decision the case was assigned to Judge Gische because she had clearly demonstrated an ability to make absurd legal decisions based on party affiliation in the Giuliani divorce. Divorce case lasted for four years. Custody of the son was illegally awarded to the wife in gross violation of NYS DR 240 that mandates that biological parents have priority. Husband was the only biological parent. Judge Gische engaged in extortion. After leaving defendant with no funds, she demanded support payments or his

consent in making payments out of the son's assets of $2,500,000 of which defendant was trustee. Her intent was to label son's assets as part of the marital estate. She threatened defendant with incarceration and when defendant refused to consent defendant was incarcerated for two months. Eventually she demanded that wife's attorney proceed by motion in limine to label son's assets as part of the marital estate. She instantly granted the motion. In her final decision she awarded $23,000,000 to the wife and left husband penniless and owing the wife an additional $8,000,000. The marital estate was only $15,000,000. NYS case law is clear, "after a long marriage its 50-50%". Judge Gische having prolonged the litigation for four years, having been instrumental into insuring husband could not work during the pendency of litigation and having forced liquidation of all four residences was able to reduce the marital estate to about $4,000,000 after all taxes, legal expenses, expert fees, commissions, penalties for premature liquidation of retirement assets were paid. She even left the son penniless and the wife straggling. Judge Gische appears to have received approximately $50,000 during her reelection campaign in straw contributions. She was also removed from matrimonial after her decisions in the Giuliani and Papadopoulos divorces. **There is no other matrimonial case in the State of New York where the wife was awarded 153% of a substantial marital estate and the husband owed the wife 53% of the estate.**

2. **Papadopoulos vs Gassner 602273-07 NYS Supreme Court**, Plaintiff seeking $167,000 pursuant to contracts from a pretend girlfriend acting in concert with the FBI/PBM. Case was again assigned to Judge Braun former public defender. Case was dismissed due to appearance default as the subway Plaintiff was riding was stopped by the Police for 45 minutes and the judge refused to entertain motion to vacate default judgment.

3. **Papadopoulos vs. Kaminska 08-104493 NYS Supreme Court.** Plaintiff was seeking $75,000 pursuant to contracts from a pretend girlfriend while acting in concert with FBI/PBM. Defendant failed to repay loans. Case was assigned to Judge Scarpulla former federal employee and attorney with FDIC. Judges that were formerly federal employees are extremely rare in NYS Courts. Plaintiff after realizing that Judge Scarpulla was assigned a case where the Federal Government and the FBI had an interest abandoned the case. One case that Judge Scarpulla was assigned was Reisner v. Catone (929 NYS .2d 403) where a psychiatrist sued the office of Professional Discipline, Department of Education seeking to have a Dr. Leso investigated and disciplined as he was teaching

correction officers in Guantanamo Bay Prison how to torture detainees obviously in gross violation of his Hippocratic Auth.

4. **Marks Peneth vs. Papadopoulos 601039-08 NYS Supreme**. In this case accountants compiled bogus bills and sued Papadopoulos. <u>Case was assigned to Judge Sherwood a native of Jamaica. Judges from the Caribbean are extremely rare in NYS Civil Courts.</u> Court refused to allow evidence and testimony that defendant having a BA in Economics and a MBA in Finance/Statistics compiled all the reports for the accountants to put in their letterhead and sign. Judge Sherwood also did not require Plaintiff to prove the work they had done and relayed on bills compiled by the accountants. Absurd Judgment was awarded for the Plaintiffs in the amount of $57,000 for work they never did. Judge Sherwood appears to be routinely assigned cases where the PBM has an interest and renders unreasonable decisions. In Trump Securities LLC v Purolite Co. (2012 NY Slip Op 06366) he awarded some $600,000 to the Plaintiff and he was criticized by the First Department stating that "recovery here is substantial given the more limited nature of the services... provided". Trump Securities LLC is an extremely secretive entity with no website and a fake telephone number listed. It is a small investment banking boutique with a formidable record of suing their clients in state and federal courts. Complainant in the criminal proceedings Julia Mineeva currently works for them.

5. **Papadopoulos vs. DCFS (DBA Mercedes Benz) NYS CV077246-08. Civil Court,** Plaintiff sued for $25,000 which was the equity in his car as defendant improperly took possession of his car. <u>Case was initially assigned to Judge Engoron a member of the Dominican Republic Bar Association who summarily dismissed Plaintiff's claims</u> and ordered an inquest on Defendant's counter claims. Another Judge, Judge Moulton held an inquest and awarded Defendant a judgment in the amount of $100,000. $60,000 for attorney fees plus the car. $60,000 award for attorney's fees in Civil Court is absurd in a case where there were was one motion to dismiss, no discovery and only a two hour inquest.

6. **Papadopoulos vs. Argo, Tama Davis et al 067932CVN07. NYS Civil Court.** Plaintiff trying to collect pursuant to contracts and fraud. Defendant defrauded plaintiff by offering to sublet her apartment, taking plaintiff's $10,000 and fleeing to the West Coast. <u>Plaintiff was ordered by Judge Engoron a member of the Dominican Republic Bar Association to serve defendant by publication in the NY Times which cost some $5,000 even though other newspapers charge less than $1,000.</u> Since Defendant lived in the West Cost there was no

possibility Defendant would see the advertisement. It was a form of extortion by Judge Engoron stating "either spend \$5,000 or abandon the case". Defendant obtained 13 bench trial adjournments after the case was marked "final". Numerous Judges including Engoron, Bluth, Moulton, Mendez (Judge Mendez a native of the Dominican Republic actually initially issued a favorable order expediting the case and then overruled himself upon motion to renew and reargue) and others tried to extort Plaintiff's cooperation in abandoning the case by perpetually adjourning trial. **There is no other case in NYS where trial has been adjourned at the request of the defendant 13 times after it was marked final.** Eventually Judge Nervo conducted a mockery of a trial not allowing Plaintiff to testify and not allowing Plaintiff to examine witnesses and absurdly awarding \$50,000 to the Defendant. During the lunch break numerous court employees knowing that Judge Nervo intended to frustrate Plaintiff followed Plaintiff around, including the restroom, to insure that plaintiff did not take out his frustration at the building. Judge Nervo was a Criminal Court Judge for the years 2009-2011.

7. **Papadopoulos vs. Arwin 74th street et al NYS Civil Court 67931-07**. Litigation pursuant to the Fair Credit Reporting Act. Derogatory information was improperly entered in Plaintiff's credit report for the purpose of cutting off credit. Case was assigned to Judge Engoron a member of the Bar of the Dominican Republic and improperly dismissed. Judge Engoron ignored the FCRA and erroneously stated that in a claim pursuant to the act a showing of malicious intent is required. This is not true as the act allows claims for negligence. Plaintiff was able to settle identical cases for about \$5,000 before any Judge formerly in criminal justice or having an origin form the Caribbean dismissed them.

8. **Eisenberg vs. Papadopoulos NYS Civil CIV11065-09** A lawyer compiled bogus bills and sued Papadopoulos. During trial the court refused to allow testimony and evidence that Defendant did all the work for the Lawyer to submit it to the Court in his absence to Europe. Court awarded judgment for \$10,000 to plaintiff for work he never did.

9. **Papadopoulos v Mineeva NYC Small Claims CS2594-10** . After three years, Plaintiff abandoned case concluding there is no chance any Judge in the State of New York will find in his favor regardless of the merits of the case. Mineeva, a prostitute and the complainant in the criminal proceedings stole about \$5,000 of property from Plaintiff's apartment. Plaintiff reported it to the police and police wrote a report but refused to pursue recovery the property. Had

this matter gone to trial any Judge would have believed the prostitute and dismissed the claims.

10. **Revcon LLC v Mineeva NYC Small Claims CS62252-09** After four years, case was dismissed while Plaintiff was incarcerated. Judge Moulton refused to grand motion to reinstate case despite no appearance by defendant. Plaintiff refilled claims as Papadopoulos v Mineeva SC2650-12 pursuant to contracts for refusing to pay for services rendered. Plaintiff has a written contract, evidence that he performed evidence of non-payment evidence that there was an understanding among parties that money was due. Plaintiff was able to obtain a default judgment probably to be vacated in about 11 months.

11. **People v Papadopoulos. Southampton Justice Court, 10090308**. Criminal Proceedings. Upon allegations by Mineeva, the prostitute the FBI/PBM retained, Defendant was arrested for Harassment in the second degree a violation according to NYS Penal Code. Violations are customarily punishable with a $30 fine and routinely dismissed leaving no criminal record. The Honorable Judge Kooperstein ordered a psychiatric examination. **In the entire criminal history of the State of New York no court has ever ordered a psychiatric examination where the charge was a violation.** Defendant is not even a resident of Southampton and Southampton tax payers were paying for the examination and possible involuntary confinement.

12. **People v. Papadopoulos NYC Criminal proceedings 10-068924**. Upon allegations of Mineeva for verbal incidents, that took place a year earlier, claiming that Defendant called her a prostitute and told her she was working for the FBI, which caused her fear and alarm for her health and safety, Defendant was arrested for Aggravated Harassment in the second degree a misdemeanor. Case was assigned to Judge Amaker a native of Puerto Rico. Judges from the Caribean are extremely rare in NYS Criminal Courts. The attorney assigned to him was also a Ms. Chevalier native of Haiti. Judge Amaker ignored several motions by defendant to dismiss. She ignored motion to dismiss claiming violation of due process and speedy trial constitutional rights. She ignored NYS CPL 30.30 readiness by prosecutor, 530 rights to bail when the highest charge is misdemeanor, and failed to complete CPL 730 stopping at 730.30 ordering one examination and conducting one hearing while two examinations and two hearings are required. In sum Defendant was entitled to dismissal based on CPL 30.30, entitled to bail based on 530 and two evaluations and two hearings based on 730. Lawyer appointed by the State failed to represent him property and committed malpractice. Among others

failed to elevate case to Supreme Court where defendant would have been eligible for a grand jury and could easily prove to a jury he was innocent of the charges. Failed to attend Psychiatric examinations. Having knowledge of the existence of examinations attesting to defendant's sanity failed to introduce them as evidence. During a hearing he even failed to object once to the testimony presented as State Psychiatrists absurdly concluded that if "you believe that the FBI will cooperate with gangsters you are delusional" ignoring the findings in US v John Connolly and related cases. Lawyer even failed to cross examine Psychiatrists as to their conclusions. Eventually Judge Amaker incarcerated defendant for three months at Rikers Island and detained him for three months at Manhattan Psychiatric Center. **No first time offender, accused of a non-violent misdemeanor, with no determination of dangerousness has ever spent time in prison and in a mental institution in the State of New York.** Eventually Judge Amaker appears to have enriched herself by purchasing a $1,000,000 mansion in Fieldstone, Bronx.

13. **In The Matter of Gregory Papadopoulos. 531047-11 NYS Supreme Court.** This case arose while Papadopoulos was detained at Manhattan Psychiatric center. First he was illegally detained without any determination of dangerousness as required. There were three hearings regarding his release and regarding forced administration of drugs. In all three hearings the State trucked in every single judge that sits in the Appellate Term obviously to prejudice his appeal. The State failed to honor an OSC pursuant to MHL 9.35 demanding a jury trial regarding his release. Upon his release Papadopoulos made an IFP OSC to seal psychiatric records at MPC pursuant to MHL 33.14. This application should have gone to the "Part Term" Judge, however was diverted to Judge Scarpulla, former federal employee and denied. Motion to renew and reargue was also denied.

14. **Papadopoulos v City of New York 10-CV-066177** This case is against the City of New York for false arrest and injuries suffered during the arrest. Two NYPD detectives from a far away precinct broke into Plaintiff's apartment without a warrant at 12:30 am, used exercise force and broke Plaintiff's ribcage. They arrested him and brought him into a precinct. They refused to investigate by asking any questions and advised him it "had something to do with his girlfriend". They detained him for 43 hours in the precinct. While in police custody they took him to a hospital where he was diagnosed as having been assaulted and had a broken rib. They waited until 6:00 pm in the eve of Yom Kippur to bring him to court. They knew that in the eve of Yom Kippur the only

Part open was Part D where Judge Amaker (Puerto Rican) was presiding. While in Court Plaintiff found that he was being charged with some verbal incidents that had taken place a year ago. (What took them so long?). Upon release they kept Plaintiff's cell phone that had pictures of Mineeva and could have been used in his defense. They also kept his keys and returned to his apartment for the purpose of destroying evidence that could have been used in his defense. Plaintiff has Hospital records attesting to the rib fracture labeling it as assault and numerous emails, dated pictures, dated computer files and cancelled checks for sex attesting to the fact that Mineeva lied to the police. After two years the case is still at the conference level as the City is making unreasonable documents request and every judge in Civil Court is granting adjournments.

15. There are an additional ten NYS less substantive cases filed against people who acted in concert with the FBI/PBM, However Papadopoulos never prevailed in a motion or in his claims.

Prior to 2000, Plaintiff with no knowledge of the Law had 100% successful prose litigation and collection record, prevailing against the City of New York in NYC Small Claims for damaging his car while towing it away, a NYC camera store in NYC Small Claims, a building contractor for failing to complete his contract and $52,000 against Merrill Lynch. He also had a good record with lawyers prevailing against a substantive adverse possession claim in Florida.

**Conclusion:** The above record clearly proves that starting with 2000 judicial assignments in Papadopoulos cases have not been random, and indeed Judges have been selected based on two criteria: first a background in criminal justice or similar conservative type of ideology believed to be submissive to the FBI, or an origin or affiliation with the Caribbean and easily enticed or possibly bribed by the Fanjul family. The Fanjuls own a spectacular 7,000 acre oceanfront resort, Casa De Campo in the Dominican Republic where they are known to entertain for free, Presidents, Senators and other high ranking government officials. It would not be unthinkable to offer free vacations there to a judge, especially a judge that frequently travels going home to the Caribbean.

This record of litigation and judicial assignments clearly proves the cooperation between the FBI and the Palm Beach Mafia (Alfonso and Pepe Fanjul) and clearly proves that Plaintiff's claims are not frivolous. No other high profile resident in Palm Beach has anything to do with the Dominican Republic and the Caribbean.